UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

WENDELL HALL,

Plaintiff,

v. Case No. 2:25-cv-207-SPC-KRH

COURTNEY JONES, et al.,

Defendants.

---

# OPINION AND ORDER

Before the Court are three pending motions in this civil rights case. Plaintiff Wendell Hall is a civil committee at the Florida Civil Commitment Center (FCCC) in Arcadia, Florida. Acting *pro se*, he has sued two Defendant FCCC officials, Clinical Director Courtney Jones[1] and now-former Security Director Glean Brown (collectively "Defendants"), seeking damages and injunctive relief under 42 U.S.C. § 1983. In the first pending motion, Hall seeks emergency injunctive relief and a hearing. (Doc. 39). Both that motion and Hall's claims more broadly are founded on allegations that Defendants failed to protect him from assault by another FCCC resident. Also pending are

---

[1] Defendants have submitted a declaration from this individual indicating she is now known as "Courtney Jones Carner." (Docs. 45-1, 47-1). However, Defendants answer and briefing continues to refer to her as she is named in the complaint, "Courtney Jones." (*See* Doc. 34 at 1; Doc. 45 at 1; Doc. 47 at 1). Therefore, the Court will do likewise.

cross-motions for summary judgment by Hall (Doc. 42) and Defendants (Doc. 47). For the reasons that follow, the Court will deny Hall's motions and will grant summary judgment to Defendants.

**Background**

Hall is an involuntarily civil detainee at the FCCC. The FCCC is not a prison; rather, it houses sexually violent predators in a secure setting after the expiration of a criminal sentence. *See Pesci v. Budz*, 730 F.3d 1291, 1292 (11th Cir. 2013). On February 18, 2025, Hall was involved in a physical altercation with another FCCC resident, Andrew Preston. Hall says Preston assaulted him, punching him twice in the face and grabbing him, causing both of them to fall to the floor, where Preston continued to punch him in the face and head. FCCC staff separated them. Hall claims Preston verbally threatened to beat him up again. Hall denies that he touched Preston before Preston hit him, and Hall denies ever throwing a punch or hitting Preston.

Hall maintains that, as a result of this episode, he had severe pain, swelling, and scratches to his face; a painful lump and bruise on his head; as well as severe mental anguish and depression. Immediately following the incident, he was escorted to the FCCC health center. Hall was documented to have a "small lump to [his] left forehead just above [the] brow, three lumps to [his] right forehead, and one lump to [his] left posterior head." (Doc. 45-3 at

3). Hall was treated with an ice pack. He then told the nurse, “I’m good,” denied any pain, and declined further treatment.

Hall and Preston were each charged with a disciplinary violation for fighting. An administrative disciplinary hearing ensued on February 26, 2025. Hall appeared at the hearing; Preston did not. Both Defendants, along with a third official not named as a party in this case, presided at the hearing. Hall proclaimed his innocence, insisting Preston assaulted him. Hall claims he also stated at the hearing that he feared for his safety because Preston had threatened to beat him up again and asked Defendants to be assigned to a separate dormitory than Preston. According to Hall, Defendant Jones replied she did not care and that Hall would just have to fend for himself. Hall maintains Defendant Brown similarly stated he could not help and did not care and that it was not his problem. Jones and Brown deny making any such statements. Indeed, they deny Hall even claimed at the hearing to be in fear for his safety or in need of protection or that he asked to be separated from Preston.

At the conclusion of the hearing, the disciplinary panel sustained the fighting charges against both Hall and Preston and imposed 30 days of confinement for each. The panel acknowledged Hall had claimed he had simply walked past Preston, who then assaulted him. However, the panel found Hall’s version of events was controverted by a video recording of the incident, which

is not in the record. The panel's decision characterized the recording as depicting the following:

> Mr. Hall was observed to engage in a verbal altercation with [Mr. Preston] down the dormitory's hallway, before turning to charge down the hallway toward [Mr. Preston] aggressively. Mr. Hall was not observed attempting to "walk past" [Mr. Prestson]; rather he approached [Mr. Preston] directly to the point that both residents were "chest-to-chest" in proximity before the physical altercation ensued. [Mr. Preston], prior to this, did not pursue nor enter Mr. Hall's personal space.

((*See* Doc. 42-1 at 13). Both Defendants similarly testify to the contents of the recording, stating:

> Camera footage revealed that Mr. Hall approached Mr. Preston in an aggressive manner and there was a verbal exchange. Mr. Preston walked away toward his own room. Mr. Hall walked toward the area of the dorm where his shoes were located and put on his shoes. Mr. Hall then charged down the hallway aggressively toward Mr. Preston and got chest-to-chest with Mr. Preston and the two Residents made contact with each other. An altercation then ensued between the Residents.

(Doc. 47-1 at 3, ¶ 9; 47-2 at 3, ¶ 9). Hall, on the other hand, insists, "The video camera recording does not show me pushing or touching Preston with my hands, chest or with any part of my body, but only shows me walking towards Preston, then he physically assaulted me for no reason." (Doc. 49 at 2, ¶ 7). Hall further states, "[T]he video camera footage … shows that I never threw a punch … but that [Preston] … punched me first in my face and we both fell to the floor and Preston then continued to punch me in my face …." (*Id.* ¶ 6).

Defendants recognize Hall also presented a statement from another resident, Raymond Senterfitt, in connection with the disciplinary charges. Senterfitt claimed Hall and Preston were arguing over switching rooms when Hall started walking towards the day room. Senterfitt said he heard a commotion and saw Hall on the floor with Preston on top of him, hitting his face. Defendants determined, however, that Senterfitt's testimony did not contradict the video evidence, as it was not disputed that Hall and Preston had a physical altercation.

Following the incident, Hall and Preston were confined in separate dormitories. But beginning ten days later, February 28, 2025, they were again put in the same one. On March 1, 2025, Hall submitted a written communication form to Jones stating he was in fear of being assaulted again by Preston and wanted to be assigned to a separate dormitory. On March 4, 2025, Jones responded. She noted that, as stated in the disciplinary decision, the video recording showed the February incident had been a "fight, not an assault." She added that if Hall "had concerns for his safety, he could speak to security staff to request Protective Management."

Hall claims he also submitted a similar form in FCCC institutional mail addressed to Brown on March 2, 2025. On that form, Hall stated he was in fear for his life because Preston had previously assaulted him and threatened to do so again. Hall therefore asked Brown to separate him from Preston. The

form contains no acknowledgement or other response from Brown. Indeed, Brown denies having seen the document until this litigation.

Hall commenced this action on March 6, 2025,[2] claiming Defendants were liable for failing to protect him from the risk of further assaults by Preston. Meanwhile, according to Hall, Preston assaulted him again on March 16, 2025, punching him in the face and causing "severe physical pain and injury." (Doc. 42-1 at 5, ¶ 19; *see also* Doc. 33 at 5, ¶ 20). However, Hall makes no claim he sought, received, or needed medical treatment. Further, Defendants deny being aware of the incident until this litigation. Indeed, there is no indication Hall or anyone else brought this alleged assault to the attention of Defendants or other FCCC staff until August 2025, when Hall first served a second amended complaint mentioning it. (*See* Doc. 25 at 5, ¶ 20). Brown also ceased to be the FCCC Security Director sometime in August 2025.

On January 29, 2026, Hall filed a "Motion for Emergency or Urgent Order or Motion for Order or Motion for Hearing." (Doc. 39). It is one of the motions now pending and is accompanied by a declaration from Hall.[3] (Doc.

[2] The Clerk formally docketed Hall's complaint on March 13, 2025. (Doc. 1). However, because Hall is confined and acting *pro se*, his filings are generally deemed filed on the date presented to FCCC officials for mailing. *See Boatman v. Berreto*, 938 F.3d 1275, 1276 (11th Cir. 2019).

[3] Hall at times refers to this and other evidentiary statements by him as "affidavits." (*See* Doc. 40; Doc. 42-1 at 3–7; Doc. 49). However, these documents are not sworn before a notary and do not comply with the requirements of a true affidavit. However, they do recite that the statements they contain are made under penalty of perjury. Therefore, they qualify as unsworn declarations that can substitute for an affidavit under 28 U.S.C. § 1746.

40). He there alleges that, on January 28, 2026, Preston angrily approached him as Hall was using the telephone in their dormitory, with Preston expressing that Hall's phone use was disturbing him. Preston again threatened to beat Hall up, pushed him hard in the face, and slapped him repeatedly. However, Hall does not claim he suffered injury. He again also makes no claim to have sought, received, or needed any medical treatment.

Hall alleges he told Defendant Jones about the incident later that day, again claiming to fear for his safety and asking to be separated from Preston. Jones allegedly refused.[4] In his emergency motion, Hall seeks an order requiring Jones to protect Hall by keeping him and Preston in different dorms. Upon receipt of Hall's motion, the Court issued its standing order regarding confined persons claiming an imminent risk of serious physical harm. (Doc. 41). Hall has not filed a pleading containing allegations related to the January 28, 2026, assault. In their respective summary judgment declarations, neither Jones nor Brown specifically mention this January 2026 incident.

On April 16, 2026, Hall moved for summary judgment. (Doc. 42). That motion was accompanied by an evidentiary submission. (Doc. 42-1). Defendants filed an opposition (Doc. 45), with an evidentiary submission of

---

[4] Hall asserts he also communicated with FCCC Facility Director Jarad Anderson on January 29, 2026, and requested to be separated from Preston. (Doc. 40). Hall says that Anderson also refused. However, Anderson is not a party to this case, so he faces no potential liability here. Nor does Hall argue that Jones or Brown could be liable for Anderson's conduct.

their own. (Docs. 45-1 to 45-9). On May 26, 2026, Defendants filed a cross-motion for summary judgment (Doc. 47), relying on the same evidence they filed in opposition to Hall's summary judgment motion. (Docs. 47-1 to 47-9). Hall responded with a supplemental declaration (Doc. 49) and more briefing. (Docs. 50, 51). Defendants did not file a reply in support of their motion for summary judgment. All pending motions, *i.e.*, Hall's "emergency motion" and the cross-motions for summary judgment, are ripe for decision.[5]

**Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a material fact is in genuine

[5] Hall suggests the "defendants' response to the plaintiff's motion for summary judgment requested … summary judgment in their favor." (Doc. 50 at 2). He then argues that the "defendants' response cannot be converted to a motion for summary judgment for their requested relief, since the court has not provided plaintiff a 10-day notice and an opportunity to respond to defendants' response treated as a motion for summary judgment." (*Id.*) Hall misapprehends Defendants' filings and the procedures attending summary judgment under Fed. R. Civ. P. 56. Defendants filed an opposition to Hall's motion for summary judgment (Doc. 45), but they also separately filed their own, separate cross-motion for summary judgment in their favor. (Doc. 47). Accordingly, the Court need not "convert" anything. Rather, the Court considers Hall's motion for summary judgment, Defendants' opposition to that motion, and Defendants' cross-motion just as they characterize themselves. The Court's scheduling order and Rule 56 put Hall on notice that he was authorized to file evidence and argument in opposition to Defendants' cross-motion for summary judgment. (*See* Doc. 35 at 2–5, ¶ 4). In fact, since Defendants filed their summary judgment opposition and cross-motion, Hall has filed additional evidence in the form of a supplemental declaration (Doc. 49) and additional briefing (Docs. 50, 51), all of which the Court will consider.

dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden to show a lack of genuinely disputed material fact. *Clark v. Coats & Clark*, 929 F.2d 604, 608 (11th Cir. 1991). If carried, the burden shifts to the nonmoving party to point out a genuine dispute. *Id.* At this stage, a court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Rojas v. Florida*, 285 F.3d 1339, 1341–42 (11th Cir. 2002). That the parties have filed cross-motions for summary judgment does not alter the standard. *See United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed[.]" (citation omitted)). That is, a court considers cross-motions for summary judgment distinctly, viewing the evidence and drawing reasonable inferences in favor of the non-movant on each one. *See Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n*, Inc., 115 F.4th 1266, 1287 (11th Cir. 2024).

**Analysis**

To establish a § 1983 claim, a plaintiff must prove that (1) the defendant deprived him of a right secured under the Constitution or federal law, and (2) the deprivation occurred under color of state law. *Bingham v. Thomas*, 654

F.3d 1171, 1175 (11th Cir. 1998)). In addition, the plaintiff must establish an affirmative causal connection between the defendant's conduct and the constitutional deprivation. *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1059 (11th Cir. 2001).

There is no dispute that, as members of the FCCC staff, Defendants were acting under color of state law. *See Hall v. Carner*, No. 2:23-CV-595-SPC-NPM, 2024 WL 964194, at *2 (M.D. Fla. Mar. 6, 2024). The issues, rather, are whether Hall suffered a violation of his constitutional rights and whether any violation was caused by Defendants.

In *Youngberg v. Romeo*, the Supreme Court held that involuntarily committed persons have a right to reasonably safe conditions of confinement under the Fourteenth Amendment's Due Process Clause. 457 U.S. 307, 322 (1982). Those rights are "at least as extensive" as the Eighth Amendment rights of prisoners, so "relevant case law in the Eighth Amendment context also serves to set forth the contours of the due process rights of the civilly committed." *Dolihite v. Maughon*, 74 F.3d 1027, 1041 (11th Cir. 1996).

The Eighth Amendment's "prohibition on cruel and unusual punishments requires prison officials to 'take reasonable measures to guarantee the safety of the inmates.'" *Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). That encompasses a duty to protect prisoners from violence at the hands of other

inmates. *Farmer*, 511 U.S. at 833. "But that does not mean that prison officials are liable for every act of inmate-on-inmate violence." *Daniels v. Felton*, 823 F. App'x 787, 789 (11th Cir. 2020). A plaintiff must demonstrate three elements to establish a failure-to-protect claim: (1) confinement conditions posing a substantial risk of serious harm; (2) an official's deliberate indifference to that risk; and (3) causation. *Cox*, 15 F.4th at 1358.

The first element "is assessed objectively and requires the plaintiff to show conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (internal quotation marks and citation omitted). The second element—deliberate indifference—requires: "(1) the defendants' subjective knowledge of the risk of serious harm; (2) disregard of that risk; and (3) conduct that amounts to more than mere negligence." *Daniels*, 823 F. App'x at 789. To be liable, each defendant "must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and also draw the inference." *Marbury*, 936 F.3d at 1233 (cleaned up). Defendants contest Hall's ability to prove any element of his claims.

Hall does not appear to claim Defendants are liable for failing to protect him from the initial altercation on February 18, 2025. However, to the extent Hall might be raising such a claim, he fails to show Defendants were deliberately indifferent to a substantial risk of serious harm at that time. The

fact that an attack occurred cannot itself show such a risk existed. *See Brooks v. Warden*, 800 F.3d 1295, 1302 (11th Cir. 2015). Hall does not present evidence that Preston had a history of violence or animosity towards Hall, other FCCC residents, or staff prior to the first altercation. Nor does Hall claim he faced a substantial risk of serious harm from other residents more generally. Hall now claims Preston also assaulted him on March 16, 2025, and January 28, 2026, and assaulted an FCCC staff member in April 2026. However, "whether a prison official is deliberately indifferent is judged—both objectively and subjectively—on the facts the prison official knew at the time she responded to the risk of harm to the prisoner." *Mosley v. Zachery*, 966 F.3d 1265, 1271 (11th Cir. 2020); *see also Brooks*, 800 F.3d at 1301. Accordingly, when assessing whether, at the time of the February 2025 altercation, Defendants were deliberately indifferent to a substantial risk of serious harm, subsequent events are irrelevant.

Given the lack of evidence that there was a substantial risk of harm or that Defendants were deliberately indifferent to such a risk prior to the initial altercation in February 2025, Defendants are entitled to summary judgment on any claim alleging they failed to protect Hall from that altercation. *See Oliver v. Harden*, 587 F. App'x 618, 620 (11th Cir. 2014) (affirming summary judgment for defendants where the plaintiff and another inmate "had no conflict prior to the attack, none of the guards had any knowledge that [the

other inmate] was particularly violent, and [the plaintiff] had not asked … to be protected from [the other inmate].”).

Hall clearly does claim, however, Defendants are liable for failing to protect him *after* that first incident. In particular, Hall alleges in his latest complaint that Preston assaulted him less than a month later, on March 16, 2025. Hall claims Preston punched him in the head and back, causing severe pain and mental anguish. There is no evidence that Hall reported the incident or that he sought, received, or needed any medical attention. Nevertheless, Hall argues he faced a substantial risk of serious harm at that time based on the February incident, which had included a threat by Preston to beat him up again. Hall also maintains Defendants were deliberately indifferent to that risk. Specifically, Hall emphasizes Defendants were aware of the February altercation, and he claims he advised Defendants of Preston’s threat asked to be assigned to a different dormitory for protection.

The record does not establish that Hall faced a substantial risk of serious harm before the March 2025 incident. Because this element is judged by an objective standard, Hall’s subjective fears or beliefs do not control. To be sure, Hall and Preston had a physical altercation the preceding month. But the record shows the fight was spontaneous and Hall’s injuries were minor, despite Hall’s vague and unsupported claims of severe pain and mental anguish. Immediately after the skirmish, Hall was taken to the nurse, who observed

only superficial bumps and bruises that were treated with an ice pack. The nurse further documented that Hall stated, "I'm good," denied any pain, and declined further treatment. Hall does not dispute that account. Further, there is no evidence that Hall and Preston had prior animosity or that Preston had a history of violence with other residents or staff.

Even if Hall could show he faced a substantial risk of serious harm at the time of the March 16, 2025, incident, the evidence fails to support that either Jones or Brown was deliberately indifferent to such a risk. In the context of potential inmate-on-inmate violence, "not every risk carries an inherent threat at a substantial level, or of severity beyond the norms." *Lakin v. Barnhart*, 758 F.3d 66, 72 (1st Cir. 2014) (Souter, J., sitting by designation). "The unfortunate reality is that threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Marbury v. Warden*, 936 F.3d 1227, 1236 (11th Cir. 2019); *see also Milledge v. Fla. Dep't of Corr. Sec'y*, 760 F. App'x 741, 744 (11th Cir. 2019) (holding that a single threat by the plaintiff's cellmate was insufficient to show a substantial risk of serious harm). Likewise, that an inmate has sought and been denied protective custody does not itself mean officials were deliberately indifferent to a substantial risk of serious harm. *See McClinton v. Warden, Baldwin State Prison*, 172 F.4th 1276, 1285–86 (11th Cir. 2026); *see also Mosley v. Zachery*, 966 F.3d 1265, 1271–72 (11th Cir. 2020) (rejecting that if

an inmate says he is in fear for his life, prison officials must immediately place the inmate in protective custody pending an investigation); *Alsobrook v. Alvarado*, 656 F. App'x 489, 494 (11th Cir. 2016) (holding defendant was not deliberately indifferent despite the plaintiff's remarks that he and his cellmate were having "problems" and needed to be separated). The same is true when officials decline to keep inmates separated after a prior physical altercation. *See Hodges v. Dep't of Corr.*, 61 F.4th 588, 592–93 (8th Cir. 2023). "Successful deliberate-indifference claims will generally require some further reason—beyond the plaintiff having informed the defendant officers of the threat—that a prison official could have concluded that a particular threat evidenced a substantial threat, rather than the mere possibility, of serious harm." *Marbury*, 936 F.3d at 1236.

Both Defendants were well aware of the initial altercation on February 18, 2025, having served on the disciplinary hearing panel and viewed a video recording of the incident. Hall claims he expressed fear for his safety at the disciplinary hearing because Preston had threatened to beat him up again and asked Defendants to assign the two to separate dormitories. Hall claims Defendants expressly refused that request at the hearing. Hall states he also sent written communications via FCCC institutional mail to Jones on March 1, 2025, and to Brown on March 2, 2025, in which Hall similarly claimed to fear further assault by Preston and asked for protection.

Defendants deny that Hall requested protection or separate dorm assignments at the disciplinary hearing and that they denied any such request. The Court, however, must credit Hall's testimony in addressing Defendants' motion for summary judgment.[6] But even assuming the hearing transpired the way Hall says it did, Jones cannot be liable for failing to protect Hall from the assault on March 16, 2025. In particular, Hall sent Jones a written communication form dated March 1, 2025, stating the same things Hall claims he voiced at the hearing, *i.e.*, that Preston had threatened him, he feared another assault, and he wanted to be separated from Preston. On March 4, 2025, twelve days before the next incident, Jones sent a written response stating that if Hall had concerns about his safety, he could apply for Protective Management with the FCCC security staff. It is undisputed Hall never did so. In any case, Jones's response advising Hall of the proper institutional channel

[6] The Court also notes Hall further alleges in his summary judgment declaration that Jones told him at the disciplinary hearing that she would not separate him from Preston "since [Hall] file[d] so many lawsuits against the FCCC." (Doc. 42-1 at 4, ¶ 7). Jones also denies making any such statement. But assuming she did for purposes of summary judgment, the Court recognizes that the First Amendment prohibits officials from taking materially adverse actions against inmates and other detainees in retaliation for protected expression or activities, including the filing of grievances and lawsuits regarding conditions of confinement. *See Hall v. Merola*, 67 F.4th 1282, 1294 (11th Cir. 2023). Despite the allegation in his declaration, however, Hall does not argue in his summary judgment briefs that he might recover under a First Amendment or retaliation theory. Even if he had, the complaint does not mention any statement by Jones about Hall's prior lawsuits, the First Amendment, or retaliation. Accordingly, the complaint fails to raise any such claim. *See Coon v.. Ga. Pac. Corp.*, 829 F.2d 1563, 1568–71 (11th Cir. 1987). Nor may Hall use summary judgment filings to raise new claims. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Accordingly, no First Amendment or other retaliation claim is properly before the Court.

to request protective custody was prompt and objectively reasonable, belying that she was deliberately indifferent to any risk of harm. *See Kornagay v. Tabil*, No. 2:24-CV-980-SPC-NPM, 2025 WL 833228, at *1 (M.D. Fla. Mar. 17, 2025) (defendant responded reasonably to a risk by advising the plaintiff of the proper procedure for seeking relief and forwarding the grievance to the warden). Jones is entitled to summary judgment on Hall's claim that she failed to protect him from the alleged assault on March 16, 2025.

Hall claims he also sent a similar written communication form to Brown on March 2, 2025. Brown states he never saw that form until he reviewed the copy attached to Hall's motion for summary judgment. Indeed, Defendants believe Hall fabricated and backdated the form for this case. Hall adamantly denies that.[7] Nevertheless, there is no indication within the four corners of the form or elsewhere in the record that Brown received it. The form includes spaces for an FCCC official to mark when it is received and to respond to the request, and both spaces are blank. What is more, there is no evidence regarding how internal mail is collected, sorted, and delivered at the FCCC. The Court thus declines to recognize any presumption under the "mailbox rule"

---

[7] The Court recognizes that Hall has a documented history of abuse of the judicial process, including filing fraudulent exhibits. *See Hall v. Carner*, No. 2:24-cv-338-SPC-NPM, 2024 WL 4373632, at *2 (M.D. Fla. Oct.2, 2024) (summarizing Hall's history of abusing the judicial process); *see also Hall v. Watson*, 734 F. Supp. 3d 1281, 1283 (M.D. Fla. 2024) (finding that Hall filed fraudulent documents). Of course, the Court may not make credibility determinations at summary judgment.

doctrine that the form was delivered to Brown. *See Green v. Hooks*, 798 F. App'x 411, 425 (11th Cir. 2020). Because there is insufficient evidence to dispute Brown's claim he did not receive the form, he cannot be deemed deliberately indifferent based on his failure to act on it. *Id.*

However, Hall claims he also verbally stated at the disciplinary hearing on February 26, 2025, that he feared being assaulted by Preston and asked to be housed in a separate dorm for protection. Hall asserts that Jones and Brown each expressly rejected that request. Both Defendants deny Hall's account of the hearing, but the Court accepts it as true for purposes of Defendants' motion for summary judgment.

Even so, there is no evidence that Brown or Jones subjectively drew an inference that Hall was, in fact, at substantial risk of serious harm because of the February 2025 altercation, as required to establish deliberate indifference. As discussed, the February 2025 fight alone did not establish that Hall faced a *substantial* risk of *serious* harm. Again, that prior incident was spontaneous, and Hall's injuries were not serious. Rather, he had only minor bumps and bruises. Hall denied any pain and declined treatment beyond an icepack. Further, while Hall claims Preston threatened to beat him up, there was no evidence that Preston had prior animosity towards Hall or a reputation for violence against other residents or staff. Also, Defendants determined Hall was partly responsible for causing the February incident, finding both Hall and

Preston guilty of fighting in violation of FCCC rules. Everyone agreed that Hall approached Preston while arguing with him, even if it was Preston who physically escalated the confrontation by punching and grabbing Hall.[8] *Anderson v. Darden*, No. 5:07-CV-208(CAR), 2008 WL 4376824, at *3 (M.D. Ga. Sept. 25, 2008) ("[A]cting as a provocateur to the subject altercation certainly does not support [the plaintiff's] claim that he needed protection."). Also, Hall ignored Jones's advice to apply for Protective Management, suggesting even Hall had doubts about the necessity of further protective measures. Under all the circumstances, the evidence does not support that Brown or Jones subjectively recognized the February altercation to present a substantial risk of serious harm to Hall, as required to establish the element of deliberate indifference. *See Hodges*, 61 F.4th at 592-93 (evidence established defendants subjectively determined that a prior fight between inmates did not indicate a

---

[8] Defendants stated belief that Hall was partially responsible for the fight was based primarily on a video recording of the incident. That recording might have limited how much credit the Court would have to give on summary judgment to the parties' competing accounts of the altercation. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007). However, for reasons not explained, the video is not in the record. Therefore, in resolving the cross-motions for summary judgment, the Court remains bound to accept the characterizations of the video and the underlying incident as offered by each non-moving party. Defendants claim the video shows Hall "approached [Preston] directly to the point that both residents were 'chest-to-chest' in proximity before the physical altercation ensued" (Doc. 42-1 at 13), making "contact with each other," (Doc. 45-1 at 3, ¶ 9; Doc. 45-2 at 3, ¶ 9), and that, "prior to this, [Preston] did not pursue nor enter Mr. Hall's personal space." (Doc. 42-1 at 13). Hall denies that he first touched Preston or that he hit or tried to hit Preston at any time. Rather, Hall insists Preston punched and grabbed him, thereby committing assault. For present purposes, the Court credits Hall's testimony on those points and assumes it would be borne out on the recording. However, Hall admits he approached Preston, not the other way around. (Doc. 49 at 2, ¶ 10). Nor does Hall contest the evidence that he and Preston verbally argued before they fought.

substantial risk of serious bodily injury requiring separation of the inmates, despite a prior incident involving a weapon, injuries, and gang affiliations). Defendants are entitled to summary judgment on Hall's claim that they failed to protect him from Preston's alleged assault on March 16, 2025.

Hall also insists Defendants failed to protect him from Preston *after* the March 2025 assault. In particular, he argues Defendants failed to protect him from another assault by Preston some ten months later, on January 28, 2026. However, Hall's theory that Defendants are liable for failing to protect him after the March 2025 assault has several shortcomings.

First, "the scope of litigation is framed by the complaint at the time it is filed." *Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992). Thus, a complaint does not present claims based on events occurring subsequent to its filing. *See id.*; *cf.* Fed. R. Civ. P. 15(d) (authorizing a supplemental complaint setting forth transactions, occurrence, or events happening after the filing of the operative complaint). Hall filed his operative second amended complaint on September 13, 2025. (Doc. 33). As a result, Hall's governing pleading does not—and cannot—present a claim based on the January 2026 incident.

Second, Defendants deny being aware of the March 16, 2025, incident until this litigation, and Hall fails to present evidence disputing that. Hall makes no claim that he or anyone else reported the March 2025 incident or the

January 2026 incident to anyone or that he sought, received, or required any medical attention for either one. Rather, Hall appears to have first mentioned the March 2025 assault in his second amended complaint, first served in late August 2025.[9] In any case, Defendants cannot be deemed deliberately indifferent based on events of which they were not aware. *See Mosley*, 966 F.3d at 1271. Further, Brown ceased serving as FCCC Security Director sometime in August 2025, and he could not have become aware of the contents of the second amended complaint until sometime after that pleading was first docketed on August 28, 2025.

In sum, the evidence viewed in the light most favorable to Hall fails to establish the Defendants were deliberately indifferent to a substantial risk of serious harm in violation of Hall's due process rights. There is no genuine issue of material fact, and Defendants are entitled to judgment as a matter of law. As such, Hall is not entitled to any relief, including damages or a preliminary or permanent injunction, whether sought by his pleadings or his "emergency motion."

Accordingly, it is now

**ORDERED:**

---

[9] In fact, Hall oddly neglects to mention the March 2025 in an amended complaint he signed on March 19, 2025, just three days after the assault supposedly occurred. (Doc. 6). Nor does Hall reference the incident in another amendment filed June 6, 2025. (Doc. 14).

For the reasons explained above:

(1) Plaintiff Wendell Hall's "emergency motion" for injunctive relief (Doc. 39) is **DENIED**.

(2) Plaintiff's motion for summary judgment (Doc. 42) is **DENIED**.

(3) The motion for summary judgment filed by Defendants Courtney Jones and Glean Brown (Doc. 47) is **GRANTED**.

(4) The Clerk is **DIRECTED** to terminate all pending motions and deadlines, enter judgment, and close this case.

**DONE** and **ORDERED** in Fort Myers, Florida on September 14, 2026.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

SA: FTMP-3
Copies: All Counsel and Parties of Record